No. 61,472

STATE OF KANSAS, *Appellee*, v. DUKE D. NORRIS, *Appellant*.

(768 P.2d 296)

Opinion filed January 25, 1989.

*Martha J. Coffman,* assistant appellant defender, argued the cause, and *Benjamin C. Wood,* chief appellant defender, was with her on the brief for appellant.

*Debra L. Barnett,* assistant district attorney, argued the cause, and *Clark V. Owens,* district attorney, and *Robert T. Stephan,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

Six, J.: Duke D. Norris appeals from his convictions for first-degree felony murder and aggravated robbery.

Norris claims: (1) his statements made to Wichita police detectives should have been suppressed; (2) the trial court erred in instructing the jury; (3) his counsel should have been allowed to examine the victim's psychiatric records; (4) evidence as to comparison and identification of shoe prints should have been excluded; and (5) the prosecutor's remarks during closing argument constituted prejudicial error.

We find no error and affirm.

## FACTS

On the morning of March 17, 1987, Duke Norris and Bobby Grimes applied for jobs in Wichita. After filing their applications, they secured a ride to the house of the victim, Dean Harness. Grimes and Harness had met at church in 1985. Grimes began spending time at the Harness home, discussing the Bible and helping Harness with household chores. Harness gave Grimes presents, including clothes and jewelry, loaned him money, and gave him rides. According to Anna Harness, Grimes encouraged her husband to drink, took advantage of him, and harassed both herself and her husband. At one point, Grimes and Harness had a telephone conversation that upset Harness so much his wife hospitalized him for psychiatric care.

Norris and Grimes arrived at Harness' house at approximately 10:30 a.m. They occupied the morning and early afternoon by drinking beer and whiskey, playing games, and shopping at a liquor store. Norris told Grimes that he wanted to "roll" Harness to get his money. Grimes testified he told Norris not to do it. Norris testified that Grimes said Norris had better do it before Anna Harness came home from work; Harness had asked Grimes and Norris to leave before his wife returned home.

As the visitors were preparing to leave, Norris jumped Harness and hit him over the head with a lamp. When he first approached Harness, Norris had a lock-blade knife in his hand. Grimes was scared and ran out of the house. After Harness fell to the floor, Norris checked Harness' wallet and searched the house for valuables. He also changed into a pair of Harness' pants because his were bloody.

Norris testified that he did not stab Harness; he stated he entered the kitchen to find something to wrap around his bleeding hands, which had been cut when he broke the lamp in the

attack on Harness. He then left the house and walked to Grimes' apartment.

Grimes testified that, after running a few blocks, he decided to return to the Harness house. Grimes saw Harness lying in a pool of blood on the living room floor.

A next-door neighbor testified she was talking on the phone while looking out her living room window when she saw a man fitting Grimes' description walking to the south at approximately 2:30 p.m. on the day of the murder. About ten minutes later, she saw him walking back north. About fifteen minutes later, she saw him walking south again. After she saw Grimes walk south the second time, she saw a man fitting Norris' description also walking to the south. Another neighbor testified she saw a man fitting Grimes' description running through the grass to the south between 2:00 and 3:00 p.m. the day of the murder. This second neighbor said the man went about two doors down, then turned around and came back.

Tina Grimes, Bobby Grimes' wife, testified that Bobby arrived home at approximately 4:00 p.m. that day. Norris arrived at the apartment about one-half hour later. His hands were cut. Norris told her he had been in a fight at South High School.

Dennis Grimes, Bobby's brother, testified that when Bobby arrived at Dennis' house Bobby asked to speak to Dennis privately. He told Dennis what had happened and that Norris had "screwed up." Dennis called the Harness home. A police officer answered the phone. The police came to Dennis' house and picked up Bobby for questioning.

Anna Harness testified she arrived home at approximately 4:00 p.m. on the day of the murder. She found her husband lying in the living room. Blood was everywhere. Furniture and knick-knacks were broken. She ran to a neighbor's house and called an ambulance and the police.

The attending emergency room physician testified that Harness had bled to death at the scene. She noted Harness had severe facial injuries and several stab wounds in his back. The most severe wound was in the right flank. The cause of death was severe hemorrhaging.

Norris' grandmother took him to the Minor Emergency Center at approximately 6:00 p.m. the evening of the crime. While his hands were being treated, a Wichita police officer and a detec-

tive arrived. They told Norris that they wished to speak to him about how he injured his hands. A uniformed officer was also present. They waited for approximately two hours while Norris was being treated. Although they did not attempt to initiate any conversation with Norris, Norris did volunteer the information that he had been assaulted by several males and stabbed with a knife. After Norris was released, he was placed under arrest and advised of his rights pursuant to *Miranda*; he did not make a statement at this time. He was taken to St. Francis Medical Center for further medical attention and was then transported to the City Building.

Norris was taken into an interview room at the police station at 11:05 p.m. and handcuffed to a table. Shortly before midnight, a detective took him to the bathroom. Norris was given crackers and a soft drink. The detectives began their interrogation. They filled out a personal history sheet and again advised Norris of his *Miranda* rights. In the course of the interrogation, Norris made statements to the detectives about his involvement in the crime.

A pocket knife and a bracelet which were identified as belonging to Harness were found on Norris when he was taken into custody. Two bloody knives were found at the Harness house; a kitchen knife on the organ in the living room and a lock-blade knife on one of the bedroom floors. A bloody pair of pants was found in the Harness bedroom. Hair samples found on the pants were consistent with Harness' hair. Blood samples taken at the scene were consistent with both Harness' and Norris' blood. Blood found on the kitchen knife was consistent with both the victim's and Norris' blood. The police were unable to identify any fingerprints from either of the knives.

A jury found Norris guilty of first-degree murder during the commission of a felony and of aggravated robbery.

## 1. THE NORRIS STATEMENTS

Prior to trial, defense counsel moved to suppress statements made by Norris to Wichita detectives on March 17 and 18, 1987. The trial court overruled the motion, except as to Norris' remarks in the emergency room prior to the first time he received *Miranda* warnings.

Norris contends that all of his statements should have been suppressed for three reasons: (1) his Fifth Amendment right to counsel was violated; (2) he did not adequately understand his

rights when they were recited to him; and (3) he did not voluntarily and intelligently relinquish his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

### Right to Counsel

At the time of his arrest, Norris was represented by a court-appointed attorney in an unrelated criminal matter. The trial court took judicial notice of this unrelated action during the hearing on the motion to suppress. Norris argues that the Fifth and Sixth Amendments barred the interrogation at issue because he had already invoked his right to counsel in the other case.

In *Edwards v. Arizona,* 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981), the United States Supreme Court held that, once a criminal defendant has invoked the right to counsel during police interrogation, the police are prohibited from further interrogation until counsel has been supplied or until the defendant initiates further conversation. 451 U.S. at 484-85. As Edwards had remained in custody between the two interrogations, the court held that use of the statements made after he had requested counsel was a violation of his Fifth Amendment right to counsel. 451 U.S. at 485-87.

In *Michigan v. Jackson,* 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404 (1986), the United States Supreme Court held that, once the right to counsel has been asserted at the arraignment, the police may not conduct further interrogation without counsel present and any waiver of defendant's right to counsel is invalid if made in response to police-initiated interrogation. 475 U.S. at 629-36. The defendants in *Jackson* were in continuous police custody prior to and after invoking their right to counsel at arraignment. The police were aware that counsel had been appointed. As in *Edwards,* the questioning both before and after the arraignment concerned the same charges.

The Supreme Court addressed the issue of interrogation of a defendant who had invoked his right to counsel upon interrogation for another unrelated criminal charge in *Arizona v. Roberson,* 486 U.S. _____, 100 L. Ed. 2d 704, 108 S. Ct. 2093 (1988). The defendant in *Roberson* was arrested at the scene of a burglary. When taken into custody, he stated that he did not want to answer any questions without an attorney. He remained in custody, and three days later, another officer interrogated him about a different burglary. The officer informed Roberson of his

rights and obtained an incriminating statement concerning the second burglary. The Court said: "Whether a contemplated reinterrogation concerns the same or a different offense, or whether the same or different law enforcement authorities are involved in the second investigation, the same need to determine whether the suspect has requested counsel exists." 100 L. Ed. 2d at 717.

Both the State and Norris cite *U.S. ex rel. Espinoza v. Fairman,* 813 F.2d 117 (7th Cir. 1987). In *Espinoza,* the defendant was arrested and arraigned on a weapons charge. He was represented by counsel at the arraignment. After the arraignment, Espinoza remained in custody. The police interrogated him concerning a murder, after reading him the *Miranda* warnings. Espinoza confessed to the murder. The court held that, because the State had not yet begun to prosecute Espinoza for the murder when he confessed, his Sixth Amendment right to counsel had not attached. 813 F.2d at 120-21. The court, however, did find that the Fifth Amendment was applicable:

"We conclude that Espinoza invoked his Fifth Amendment right to counsel; that this invocation remained in effect because the custodial interrogation occurred *while he remained in continuous police custody*; and that because the state initiated the interrogation, Espinoza was incapable of waiving his right to counsel. We therefore conclude that the state violated Espinoza's Fifth Amendment right to counsel and that, as a result, his confession was inadmissible." (Emphasis added.) 813 F.2d at 122.

*Edwards, Jackson,* and *Espinoza* are all distinguishable from the case at bar by one cardinal fact. The defendant in each remained in custody between the time the right to counsel was invoked and the interrogation at issue. Here, Norris invoked his right to counsel at his arraignment on the unrelated charge. He was released on bond and while free was arrested for the crime which is the subject of this appeal.

In *United States v. Skinner,* 667 F.2d 1306 (9th Cir. 1982), *cert. denied* 463 U.S. 1229 (1983), the defendant was brought to a police station for questioning concerning a murder investigation. After a brief interrogation, the defendant stated that he wanted to speak with an attorney. He was not yet under arrest. He left the station. The next day, he was arrested for the murder. Although he previously had been read his *Miranda* rights, he was again advised of his rights; nevertheless, he agreed to speak with the police and subsequently confessed to the crime. The Ninth

Circuit Court of Appeals distinguished *Skinner* from *Edwards* because Skinner was not in continuous police custody. 667 F.2d at 1309. The second interrogation was *not* a violation of his Fifth Amendment rights.

In *United States v. Geittman,* 733 F.2d 1419 (10th Cir. 1984), Geittman was indicted and arraigned for conspiracy to import a controlled substance. The government taped phone conversations between Geittman and a codefendant *after* Geittman's arraignment, while he was out on bond. The Tenth Circuit Court of Appeals found that the taping of the conversations did violate Geittman's Sixth Amendment right to counsel invoked at arraignment, but did not violate his Fifth Amendment right to counsel invoked when he was taken into custody.

Although *Skinner* and *Geittman* involve factual situations different than Norris' case, they indicate that a defendant's Fifth Amendment right to counsel terminates when he is released from custody. Norris' Fifth Amendment right to counsel terminated when he was released on bond for the first offense and would only vest again upon his request for counsel when he was arrested on the murder and aggravated robbery charges. At the time of the interrogation, his Sixth Amendment right to counsel as to the murder and aggravated robbery charges had not yet vested because adversarial proceedings on those charges had not yet been initiated.

Norris was properly advised of his right to counsel. A review of the transcript of his interrogation persuades us that he understood that right. He chose not to inform the detectives that he already had appointed counsel in another case.

## Voluntariness of the Statement

Norris argues that he did not voluntarily waive his rights. He asserts that, at the time the *Miranda* warnings were given, he was: (1) in pain due to the injuries to his hands; (2) intoxicated; and (3) tired from lack of sleep. In addition, Norris claims a learning disability also affected his ability to understand the warnings.

"When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily and knowingly given and admits the statement into evidence at the trial, the appellate court should accept that determination if it is supported by substantial competent evidence. [Citations omitted.]" *State v. Brown,* 235 Kan. 688, 691, 681 P.2d 1071 (1984).

The testimony indicated that Norris had consumed well over half a case of beer and some whiskey between 10:30 a.m. and 3:30 p.m. on the day of the murder. Norris testified that he arose at 7:30 that morning, did not have anything to eat the entire day, was drunk the entire day, and was drunk and in pain at the time of the interrogation.

The doctor that treated Norris at the Minor Emergency Center did not notice any odor of alcohol or any behavior that would indicate Norris was intoxicated. The doctor also said that the cuts on Norris' hands would give him "minimal" discomfort. Both the doctor at St. Francis Medical Center and one of the detectives who took Norris into custody noticed an odor of alcohol. They did not notice any behavior indicating that Norris was intoxicated. A detective testified that Norris did not appear to be sleepy or to have any difficulty walking. One of the detectives who conducted the interrogation said that he noticed an odor of alcohol but that there was nothing unusual about Norris' speech or mannerisms. The other detective did not notice any odor of alcohol. Norris did not appear to have any trouble responding to their questions.

The defense presented the testimony of two employees of the Wichita Counseling Center who assessed Norris' mental abilities. Susan Alberts testified as to the results of tests she administered to Norris. Although Norris did poorly on the tests, the testimony indicated that he was not given an opportunity to answer all the questions. Robert Mead, Ph.D. evaluated Norris' mental abilities based on the test results. Dr. Mead testified that the test results are translated into an IQ. Ninety to 100 is considered a normal range; Norris' full scale score was 89. In Mead's opinion, Norris has a learning disability and did not understand the *Miranda* rights read to him.

Although Norris experienced slight difficulty in reading the warnings out loud to the detectives, he was able to state what they meant in his own words; "I got have the right to just sit here and not say nothin' just—you know—I can just get a lawyer or appoint a lawyer." When listening to the tape recording of the interrogation, one is not given the impression that Norris had any difficulty understanding the questions. His speech sounded normal and clear, and was not slurred.

"The fact that an accused had been drinking and using drugs

does not per se establish involuntariness." *State v. Baker,* 4 Kan. App. 2d 340, 343, 606 P.2d 120 (1980). The trial court's determination that Norris' statement was admissible was supported by substantial competent evidence. There was overwhelming physical and eyewitness evidence connecting Norris to the crime and his trial testimony did not significantly deviate from his statements to the police after his arrest. See *State v. Newfield,* 229 Kan. 347, 360, 623 P.2d 1349 (1981).

Norris alleges that the detectives resorted to physical and psychological pressure by conducting the interrogation when he was tired, hungry, intoxicated, and in pain. Where a confession/statement is challenged as involuntary, the prosecution must prove by a preponderance of the evidence that the confession was voluntary. *Lego v. Twomey,* 404 U.S. 477, 489, 30 L. Ed. 2d 618, 92 S. Ct. 619 (1972).

Much of Norris' argument as to the pressure used to obtain his statements is a reiteration of the argument that he was impared by pain, intoxication, fatigue, and mental disability. Norris contends that the detective's statements about "cutting losses" were improper. The statements in question were as follows:

"Bobby told us that you were at Dean's house today. . . . Sometimes in a split second we do something that we wish we could take back forever—but sometimes all we can do is go forward. . . . And cut our losses. What I'd like for you to do is to be ready to accept the fact it's time to cut your losses. . . . Why don't you tell me what happened so we can step forward and take care of this. . . . I just want you to know that I'm not one of those guys that goes around and lies or bluffs people and tries to make people say stuff that they didn't do but I am somebody that records facts and I've recorded a lot of facts today. I am ready to record your facts."

There is no indication that the detectives made any promises of leniency or other benefit if Norris confessed. There was no indication that the detectives threatened Norris in any way. They merely requested that he tell the truth. There was evidence that Norris had previously been arrested on other criminal charges, so he was not unfamiliar with *Miranda* warnings and the police interrogation process.

"To render such a confession involuntary it is generally held that the promise must concern action to be taken by a public official, that the promised action must be such as would likely cause the accused to make a false statement to obtain the benefits of the promise and the promise must be made by a person whom the accused reasonably believed to have the power or authority to execute the same." *State v. Kanive,* 221 Kan. 34, 37, 558 P.2d 1075 (1976).

Norris' argument that he was overcome by physical and psychological pressure is not persuasive.

A defendant's Fifth Amendment right to counsel, which attached upon custodial interrogation for an earlier offense, terminates upon defendant's release from custody for that offense. When defendant has not remained in continuous police custody, and interrogation begins concerning a later unrelated offense, the right to counsel will only vest again upon request by defendant.

It was not error to admit into evidence the statements Norris made to the Wichita police detectives.

## 2. THE JURY INSTRUCTIONS

Norris objects to three of the jury instructions given by the trial court. He also objects to the omission of one jury instruction which was requested by defense counsel.

PIK Crim. 2d 52.09 is an instruction on the credibility of witnesses. The instruction is as follows:

"It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified."

The "Notes on Use" following the instruction recommend that this instruction should be given in every criminal case.

During Norris' trial, the jury was instructed as follows:

"It is for you to determine the weight and credit to be given the testimony of each witness. You may take into account each witnesses [*sic*] ability and opportunity to observe and know the things about which they have testified, their memory, manner and conduct while testifying, *any interest they may have in the result of this trial,* and the reasonableness of their testimony considered in the light of all the evidence in this case. You have a right to use that knowledge and experience in regard to the matter about which a witness has testified, and you may, of course, utilize your common sense." (Emphasis added.)

Defense counsel objected particularly to the statement about the witnesses' interest in the trial. At trial, Norris claimed the instruction improperly focused attention on his testimony. On appeal, Norris argues that the instruction focused too much attention on the testimony of Bobby Grimes and Anna Harness. Norris did not object to the instruction at trial on the specific ground he raises in this appeal.

In *State v. Willis*, 240 Kan. 580, 586, 731 P.2d 287 (1987), the trial court gave an expanded version of PIK Crim. 2d 52.09,

which was similar to the one given in this case. The defendant in *Willis* had not objected to the instruction at trial; consequently, the standard of review on appeal was whether the instruction was clearly erroneous. 240 Kan. at 587. We held that, although PIK Crim. 2d 52.09 was preferable, the instruction given was not clearly erroneous. 240 Kan. at 587. "[T]he fact defendant objected to the giving of a[n] . . . instruction does not, of itself, preclude the giving of such an instruction when proper." 240 Kan. at 583. The defense theory was that Bobby Grimes, not Norris, stabbed and killed Harness. Therefore, it was important to the defense that the jury understand that Grimes had an interest in seeing Norris convicted.

Norris objected to instructions No. 8 and No. 9 because, in his view, they shifted the burden of proof. The Due Process Clause of the United States Constitution requires that the State carry the burden of proof in criminal cases. An accused may only be convicted on proof beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 363-64, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970).

Instruction No. 8 stated:

"The element of malice may be inferred from the fact of a killing effected by a deadly weapon."

Norris argues that instruction No. 8 was improper because it created a presumption that shifts the burden of proof to the defendant. Malice is an essential element of first-degree murder. Norris' theory of defense was that, although he committed robbery and battery, he did not stab the victim. An absence of malice was not part of his defense. In previous cases we have stated that malice may be inferred by the fact that a homicide was committed with a deadly weapon. See *State v. Shultz,* 225 Kan. 135, 140, 587 P.2d 901 (1978) (sledgehammer); *State v. Stafford,* 223 Kan. 62, 65, 573 P.2d 970 (1977) (gun); *State v. Ritchey,* 223 Kan. 99, 101, 573 P.2d 973 (1977) (pool cue).

Norris' arguments regarding instruction No. 8 are without merit. The court merely instructed the jurors that they *may infer* malice, not that a presumption of malice was created by the use of a deadly weapon.

However, we recently observed in *State v. Beebe,* 244 Kan. 48, 766 P.2d 158 (1988):

"In recent years, we have observed a growing trend toward the simplification of instructions in criminal cases and the elimination of many instructions which

emphasize particular portions of the evidence. Although we do not consider the instruction on malice to constitute reversible error herein, we discourage the giving of this type of instruction. The use of a deadly weapon is one of the evidentiary facts from which the jury could infer malice, but we conclude it is the better practice not to give a separate instruction thereon."

The jury was fully instructed on the burden of proof by instruction No. 12. The jury was told that the defendant must be found not guilty if the State failed to prove *any* of the elements of the offense beyond a reasonable doubt.

Instruction No. 9 was PIK Crim. 2d 54.01. A finding that instruction No. 9 was error would require us to overrule *State v. Ransom,* 239 Kan. 594, 722 P.2d 540 (1986). Instruction No. 9, PIK Crim. 2d 54.01, was recently endorsed in *Beebe,* 244 Kan. at 58. Norris fails to advance a compelling reason to overrule *Ransom.*

Defense counsel requested the following instruction:

"If you find from the evidence that the defendant committed the offense of aggravated robbery, but can not conclude beyond a reasonable doubt that the defendant stabbed Geraldean Harness, intended he be stabbed, or believed that he might be stabbed by another person or persons, then you should find him not guilty of the offense of murder."

The general rule on jury instructions is that the trial court must instruct on the law applicable to all theories of the parties that are supported by the evidence. *State v. Davis,* 236 Kan. 538, 542, 694 P.2d 418 (1985). "However, evidence merely tending to refute or deny one of the elements of the crime does not necessarily constitute an affirmative defense entitled to separate instruction." 236 Kan. at 542. The defense theory in this case was that Bobby Grimes stabbed Harness.

The jury was instructed on the elements of premeditated first-degree murder, felony first-degree murder, second-degree murder, and voluntary manslaughter. An element of each of these crimes is that the defendant killed the victim. Norris' theory of defense tended to refute the contention that he had done the killing.

The trial court refused to give the instruction because it was "completely argument." Instructions should be general in nature and should not be argumentative or overemphasize one particular part of the case. *State v. Rambo,* 10 Kan. App. 2d 418, 425-26, 699 P.2d 542, *rev. denied* 237 Kan. 888 (1985). The trial court did not err in refusing to give the requested instruction.

## 3. THE VICTIM'S PSYCHIATRIC RECORDS

Norris claims it was error for the trial court to refuse his counsel access to psychiatric records of the victim. Defense counsel requested permission of the court to review the records for exculpatory material regarding the relationship between Grimes and Harness. An employee of the hospital where Harness received psychiatric care brought the records to the courtroom. The court reviewed the reports in camera and determined that Harness' psychiatric care arose out of marital conflicts with his wife. There was no mention of threat from Grimes or conflict with Grimes in the report.

The record on appeal neither includes the psychiatric reports nor contains any indication that Norris requested the reports be included in the record on appeal. "An appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. In the absence of such a record, we presume that the action of the trial court was proper.)" *State v. Bright,* 229 Kan. 185, Syl. ¶ 6, 623 P.2d 917 (1981).

## 4. EVIDENCE AS TO COMPARISON AND IDENTIFICATION OF SHOE PRINTS

Defense counsel objected to the testimony of Detective Gary Miller on the basis that: (1) shoe print identification has not been established as having scientific validity; and (2) Detective Miller was not qualified as an expert in the area.

In *State v. Jackson,* 220 Kan. 675, 677-78, 556 P.2d 885 (1976), we permitted footprint identification testimony by a lay person and indicated that expert testimony is not required for footprint testimony. Kansas has long recognized that lay testimony of the description and measurement of tracks at the scene of the crime which correspond with shoes worn by a defendant may be introduced into evidence. *State v. Adams,* 85 Kan. 435, Syl. ¶ 2, 116 Pac. 608 (1911); *State v. Christon,* 3 Kan. App. 2d 372, 374, 595 P.2d 356 (1979). Such testimony is allowed as long as the conclusions are based on measurements or peculiarities of the tracks. *Jackson,* 220 Kan. at 678.

Miller testified in detail concerning his procedure in comparing the prints found at the scene with the shoes of both Norris and Grimes. He explained that shoes have both general or family characteristics and individual characteristics. The general and individual characteristics of Norris' shoes matched the bloody

footprints found in the victim's living room.

Norris did not deny being in the victim's living room on the day of the crime. The evidence indicated that his hands were bleeding profusely. Therefore, it is no surprise that the bloody footprints found in the victim's living room matched the shoes worn by Norris on that day.

## 5. THE PROSECUTOR'S REMARKS DURING CLOSING ARGUMENT

The defense theory focused on the relationship between Bobby Grimes and the victim (indicating that Grimes had a motive for killing Harness) and the inconsistencies in Grimes' testimony. In her closing argument, the prosecutor downplayed the defense theory. She discussed the relationship between Grimes and Harness, stating: "There's some innuendoes by the witnesses, and I submit to you by defense counsel, that there was something more than this. I think that all of this evidence about whatever their relationship was, as if that makes a lot of difference, cheapens and minimized . . . ." Defense counsel interrupted with an objection. The trial court advised the jury to disregard any statements that were not evidence. The prosecutor went on to tell the jury that innuendoes of a homosexual relationship cheapened the victim's actions and intentions and drew attention away from Norris' actions. No further objections were made by defense counsel.

In *State v. Thompson,* 221 Kan. 176, 183, 558 P.2d 93 (1976), this court said: "We have stated we will not require the granting of a new trial in the absence of a showing that the objectionable statements by the prosecutor were injurious to the defendant and likely to affect the jurors to his prejudice."

In *State v. Robinson,* 219 Kan. 218, 221, 547 P.2d 335 (1976), we commented: "The prosecutor is entitled to considerable latitude in arguing the case to a jury. [Citation omitted.] There is no prejudicial error where the questionable statements of a prosecuting attorney are provoked and made in response to previous arguments or statements of defense counsel."

Here, defense counsel commented in detail on the relationship between Grimes and the victim in his closing argument. He also elicited testimony concerning the relationship between the two men. The statements by the prosecutor were in response to testimony presented by the defense which indicated that there

may have been a homosexual relationship between Grimes and the victim. The defense theory was that Bobby Grimes, not Norris, stabbed the victim. There was overwhelming physical evidence connecting Norris to the murder. The prosecutor's remarks during closing argument were not improper.

Affirmed.