NOT DESIGNATED FOR PUBLICATION

No. 114,224

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

FILIP CHASE JOSEPH ROSARIO,
*Appellant*.


MEMORANDUM OPINION

Appeal from Jackson District Court; MICHEAL A. IRELAND, judge. Opinion filed November 3, 2017. Affirmed.

*Alexandria S. Morrissey*, of Holton, for appellant, and *Filip Chase Joseph Rosario*, appellant pro se.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.


Before BRUNS, P.J., MCANANY, J., and HEBERT, S.J.


PER CURIAM: Filip Chase Rosario appeals after a jury found him guilty of aggravated criminal sodomy, rape, aggravated kidnapping, aggravated battery, and criminal threat. On appeal, Rosario raises numerous issues. His appellate counsel raised some of the issues while a pro se supplemental brief filed by Rosario includes additional issues. Based on our review of the record on appeal, we find that there was sufficient evidence presented at trial to support Rosario's convictions, and we do not find any reversible error. Moreover, the record reveals that Rosario received a fair trial. Thus, we affirm Rosario's convictions and sentence.

1

FACTS

Rosario and M.S. started dating in September 2013. Frequently, beginning in November 2013, Rosario—who lived in Topeka—would stay at M.S.'s house in Holton. On December 19, 2013, Rosario took M.S. to work in Topeka and picked her up around 6 p.m. that evening. Rosario and M.S. then drove to Holton to pick up her young daughter from her parents' house where she had been staying that day. During the trip from Topeka to Holton, Rosario asked M.S. if she had been "sleeping around" with other men. M.S. responded that she had not. Although the discussion was tense, Rosario seemed to let it go.

Upon arriving at M.S.'s house in Holton, however, Rosario became angry. While holding a kitchen knife, Rosario told M.S. he knew what she had been doing and that she could not hide it from him. When M.S. went into her bedroom to change clothes, Rosario penetrated M.S.'s vagina with his fingers without her consent. She told him that it hurt, and Rosario told her that it was "supposed to." Eventually, Rosario stopped and allowed M.S. to get dressed.

Rosario followed M.S. to the kitchen and told her to put her daughter to bed about 8 p.m. After her daughter went to sleep, Rosario and M.S. talked in the living room. At some point, Rosario hit M.S. in the face a couple of times and left the house. When he left, Rosario took M.S.'s keys and cellphone with him. Although M.S. locked the doors to the house, Rosario was able to get back in using the keys. When he returned to the house, Rosario was even angrier than he had been before he had left.

Rosario told M.S. to take a shower and she complied. After she had finished, Rosario had anal sex with M.S. on her bed without her consent. As he penetrated her, Rosario held her arm behind her back. According to M.S., she cried due to the pain and Rosario told her he hoped it hurt.

Rosario seemed to calm down for a few minutes. However, he then pinned M.S. down on the bed and put his hands around her neck. M.S. had difficulty breathing and may have lost consciousness. The next thing M.S. could remember, Rosario was no longer on top of her, but she was having difficulty talking and felt pain throughout her body.

M.S. took another shower while Rosario paced around her house. While she was in the shower, Rosario came into the bathroom and urinated on her. After she was finished showering, Rosario put his fingers in her vagina again without her consent and threatened to remove her intrauterine device used for birth control.

Over the course of the night, Rosario hit M.S. multiple times, threatened to kill her, and made other threats that placed her in fear. He also went through M.S.'s purse and began throwing things at her. Moreover, he threw a pair of shoes and a cup of coffee at her. At one point, he hit M.S. in the nose and caused it to bleed. Rosario also burnt M.S. on the chest with a cigarette several times. In addition, after telling M.S. that he wanted to see blood, Rosario made her cut her chest with a utility knife.

Around 7 a.m., M.S. told Rosario that she needed to get her daughter up and ready for school. Before doing so, M.S. took another shower to remove the ashes and other remnants of the things Rosario had thrown at her during the night. M.S. was unable to stand in the shower and sat down. Evidently, Rosario came into the bathroom and washed her hair. When she had finished the shower, Rosario told her that he would break her jaw if she did not perform oral sex on him. She complied and afterwards got ready for work. Rosario made sure that she wore clothes to cover the burns on her chest.

After M.S. got her daughter ready, she drove her to school and Rosario went with them. He then told M.S. to return to her house so that he could pack up his belongings to take back to Topeka. After he had done so, M.S. and Rosario went to a convenience store

3

to buy gas. Rosario took her keys when he went into the gas station to pay and told her that if she tried anything, he would make sure she paid for it. M.S. then drove from Holton to Topeka on U.S. 75 with Rosario sitting next to her in the car. As she drove, Rosario held a knife with him and threatened to kill her if she tried to escape. M.S. broke the speed limit in the hope of being pulled over by law enforcement officers. She was not stopped, and the two continued on to Topeka. At one point while M.S. was driving, Rosario bit her on the hand.

After arriving in Topeka, M.S. purposely allowed her car to slide off Interstate 70 into a ditch. She ran back to the highway and flagged down another vehicle. The driver of the other vehicle drove M.S. to the Topeka Police Department where she reported what had occurred. After speaking to police, she was taken to Stormont-Vail. The nurse who examined her noted that M.S. had several body injuries. Specifically, the nurse noted two bite marks; redness to her right forearm; swelling and abrasions on her bottom lip; swelling and discoloration around her eye; discoloration on her right upper arm; an abrasion behind her left ear; an abrasion on her forehead; redness and discoloration on her left outer thigh; discoloration on her collar bone; multiple superficial cuts; and burns on her chest.

During the early morning hours of December 21, 2013, Rosario was arrested in the parking lot of an apartment in Topeka. He was taken to the sheriff's office in Holton where Lieutenant Al Dunn of the Jackson County Sheriff's Department interviewed him. Two days later, the State charged Rosario with one count of attempted capital murder, two counts of aggravated criminal sodomy, two counts of rape, one count of aggravated kidnapping, one count of aggravated battery, and one count of criminal threat.

On July 1, 2014, Rosario filed a motion to suppress the statements he made to Lieutenant Dunn during his custodial interrogation following arrest. In the motion, Rosario argued that he was intoxicated at the time and was not mentally competent to

4

waive his rights. The district court held a hearing on this motion on July 11, 2014. After hearing Lieutenant Dunn's testimony and considering the arguments of counsel, the district court determined that there was no reason the statements made to law enforcement should be suppressed.

Shortly prior to trial, Rosario filed a motion for discovery on March 2, 2015, which the district court considered at a hearing on March 27, 2015, which was the Friday before the jury trial was set to commence. At the hearing, Rosario's attorney argued that his main complaint was that although approximately two weeks ago the State provided him with a copy of the video recorded statement from Rosario's interview with Lieutenant Dunn, he had only recently discovered that the disc did not work. Defense counsel had been in contact with the State to attempt to rectify the problem, and the State provided defense counsel with a working copy at the hearing. The prosecutor stated that she had given defense counsel a copy almost immediately upon his request for it and that the sheriff's office had verified that that copy worked.

Due to the delay in receiving a working copy of the disc of Rosario's recorded statement, defense counsel requested a continuance of trial. In the alternative, his attorney argued that the district court should not allow Rosario's statement to be used at trial. Ultimately, the district court found:

> "You've had adequate time. If it hasn't worked for a couple of weeks and you've been working with her, you should have brought it to the Court's attention before now.

> "I've been in contact with you off and on for the last month, and this is the first I've heard of this."

Although the district court denied the request for a continuance, it arranged for Rosario and his attorney to watch the video at least three times over the weekend before trial.

5

The district court held a three-day jury trial from March 30, 2015, to April 1, 2015. At trial, five witnesses testified and approximately 90 exhibits were admitted into evidence. The first witness was Lieutenant Dunn, who testified that he was contacted by the Topeka Police Department on December 20, 2013, to inform him that M.S. had reported a sexual assault and had been taken to the hospital for a medical examination. According to Lieutenant Dunn, he went to the hospital in Topeka and spoke with a nurse and eventually with M.S. He testified that M.S. told him what had happened to her. A search for Rosario and for M.S.'s car was commenced, and Lieutenant Dunn located the vehicle. He testified that he took photographs of the vehicle that were admitted into evidence, which showed grass and dirt stuck to parts of the vehicle. After photographing the vehicle, Lieutenant Dunn and another office drove it back to the hospital.

Lieutenant Dunn testified that the officers received consent from M.S. to search her residence for evidence. During the search, Lieutenant Dunn took photographs. At trial, he testified about the various things that were inside the house that corroborated M.S.'s version of events. In addition, a video of an interview of M.S. conducted on December 23, 2013, was shown to the jury. During the interview, M.S. discussed Rosario's daily marijuana use and told him that Rosario had smoked PCP four or five days prior to the events that began on the evening of December 19, 2013. Lieutenant Dunn testified that the effects of PCP are felt for approximately four to six hours.

Lieutenant Dunn testified that Rosario was located wandering around a parking lot of an apartment complex in Topeka in the early morning hours of December 21, 2013. Rosario was arrested by the Topeka Police Department around 2 a.m. and transported to the sheriff's office in Holton. At approximately 3:20 a.m., Lieutenant Dunn interviewed Rosario. Lieutenant Dunn testified that he began by informing Rosario of his *Miranda* rights. Lieutenant Dunn then gave a general summary about what Rosario told him during the interview.

6

Over Rosario's objection, the video recording of the interview was played for the jury. On the video, Rosario admits: "I hurt her. I hurt her pretty bad." He states that he was "coming in and out of PCP" and that he "slapped her, bit her. . . hit her, poured ashtrays on her." Rosario stated that she was burning herself with cigarettes and that she cut herself. However, he admitted to burning her once with a cigarette. Rosario also admitted to biting her out of anger. He claimed that M.S. had consented to have sex with him. He stated that he put his fingers in M.S.'s vagina after she told him to check whether she had been with another person. Although Rosario admitted to choking M.S., he indicated that it was something they did from time to time during sex.

Afterwards, the State admitted an apology letter into evidence that Rosario wrote to M.S. at the end of his interview with Lieutenant Dunn. In addition, Lieutenant Dunn testified that while Rosario said he had turned himself in, Topeka police said Rosario was apprehended after a report of a suspicious person in a parking lot. Finally, Lieutenant Dunn testified about DNA samples he collected from Rosario.

A sexual assault nurse examiner from Stormont-Vail Hospital in Topeka testified next. She stated that she examined M.S. when she was brought into the emergency room at around 12:20 p.m. on December 20, 2013. She testified about the photographs she took of M.S.'s injuries and regarding her examination. According to the nurse examiner, she swabbed the bite marks on M.S. and collected a blood sample from her. Even though she did not notice any obvious injuries to M.S.'s genital area, the nurse examiner testified that she only finds vaginal injury in approximately 20% of the sexual assault cases she works on. She also testified that the lack of obvious injuries to M.S.'s anus was not unusual. On cross-examination, the nurse examiner testified that M.S. was not raspy or having difficulty speaking.

The State called a technician from the Kansas Bureau of Investigation biology section to testify about her analysis of the specimens taken as evidence in this case. As

7

far as specific results, the technician testified that she did not find any seminal fluid on the vaginal or anal swabs. However, she determined that Rosario's DNA was on the swab taken from a bite mark on M.S.'s hand.

M.S. then testified regarding her relationship with Rosario and the events on the night of December 19 and 20, 2013. In addition to the facts stated above, M.S. testified that before this incident, her sexual relationship with Rosairo never included biting that was hard or left a mark. Moreover, she testified that choking was never part of their past sexual relationship. In addition, although she did not consent to anal sex on this occasion, she and Rosario had participated in consensual anal sex previously.

Next, the State called Jennifer Johnson, a board certified women's health nurse practitioner and coordinator for the forensics program of the Shawnee Mission Medical Center. Johnson testified as an expert on strangulation. In particular, she testified about studies that have shown that physical damage from strangulation occurs in only 24% or 34% of people who have been strangled. However, Johnson did not examine M.S. nor did she offer any opinion as to whether M.S. had been strangled.

After the State rested, the district court denied Rosario's motion for a directed verdict of acquittal. Rosario exercised his right not to testify and did not call any witnesses. Ultimately, the jury found Rosario to be not guilty of attempted murder under any of the alternatives and not guilty of one of the rape counts. Furthermore, the jury found Rosario guilty of both counts of aggravated criminal sodomy, aggravated kidnapping, aggravated battery, criminal threat, and the other count of rape. On May 15, 2015, the district court sentenced Rosario to 775 months' imprisonment, and he timely appealed.

8

*Sufficiency of the Evidence*

On appeal, Rosario first contends that the State failed to present sufficient evidence to support each of his convictions. "When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. McBroom*, 299 Kan. 731, 754, 325 P.3d 1174 (2014). "Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations." *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

Instead of listing the elements of each of his convictions and arguing how the State failed to present evidence to support one or more of those elements, Rosario basically argues that the jury should have believed the statements he made during his videotaped interview with Lieutenant Dunn instead of M.S.'s testimony about what happened. Rosario argues that there is evidence in the record showing that the sexual and physical contact between him and M.S. was consensual. He also argues that there is evidence in the record showing that M.S. had the opportunity to leave or to direct Rosario to leave. Rosario does not specify how this evidence would disprove any of the elements of his convictions.

Nevertheless, we must view M.S.'s extensive testimony summarized above in the light most favorable to the State. In doing so, we find that the State presented sufficient evidence to support each of the charges upon which Rosario was convicted. It is not our role to reweigh the evidence. Moreover, we do not find the version of events as testified by M.S. to be so incredible that no reasonable factfinder could find guilt beyond a reasonable doubt. See *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983). Rather, we

conclude that if believed by the jury, the evidence presented by the State was sufficient to prove each of the charges upon which Rosario was convicted beyond a reasonable doubt.

*Request for Continuance*

Next, Rosario contends that the district court erred in failing to grant his motion to continue the jury trial. As indicated above, Rosario was evidently not provided with a working copy of the video of his interview with Lieutenant Dunn until three days before the trial began. As such, Rosario argues that the State violated K.S.A. 2016 Supp. 22-3212(h), which specifies that discovery must be provided to a defendant no later than 21 days after arraignment. In response, the State maintains that defense counsel stated he had the recording as early as July 11, 2014. Thus, the State argues that no discovery violations occurred.

A district court may grant a continuance to either party for good cause shown. K.S.A. 22-3401. The denial of a request for a continuance will not be disturbed on appeal absent a showing of an abuse of discretion. A decision is considered to abuse the discretion of a district court if it was arbitrary or based on an error of law or fact. *State v. Johnson*, 304 Kan. 924, 944-45, 376 P.3d 70 (2016). The party alleging an abuse of discretion—in this case, Rosario—bears the burden of proof on appeal. See 304 Kan. at 945.

Here, the record reflects that at a hearing on July 11, 2014, the parties were discussing the redaction of any inadmissible statements made within the recorded interviews that were going to be used as evidence at trial. The district court asked the prosecutor what videos the State would be introducing. In response, the prosecutor stated, "Judge, there's an audiotape of the victim, there's a videotape of the victim's interview, and then there's a videotape of Mr. Rosario's interview, and I think that's it." The district court asked, "Have you got those?" Defense counsel responded, "Yes, sir."

10

Rosario argues that the following factors should be analyzed to determine whether the district court erred in denying his motion for a continuance: "'(1) whether a continuance would inconvenience witnesses, the court, counsel, or the parties; (2) whether other continuances have been granted; (3) whether legitimate reasons exist for the delay; (4) whether the delay is the fault of the defendant; and (5) whether denial of a continuance would prejudice the defendant.'" *State v. Robinson*, 303 Kan. 11, 90, 363 P.3d 875 (2015) (quoting *State v. Anthony*, 257 Kan. 1003, 1019, 898 P.2d 1109 [1995]), *cert. denied* 137 S. Ct. 164 (2016). However, these are the factors courts apply when a defendant seeks a continuance to retain new counsel. See *Johnson*, 304 Kan. at 945-46; *Robinson*, 303 Kan. at 90; *Anthony*, 257 Kan. at 1018-19. The State points out that these cases involve weighing a Sixth Amendment right to counsel, which is not at issue in the present case.

Continuing, the State maintains that any argument that Rosario was unfairly denied a continuance because he was surprised by the State's evidence is disingenuous because the video recording of the interview contained his own statements. Moreover, the State points out that when Rosario requested to be allowed to view the video at least three times during the weekend before trial, the district court ensured that Rosario would have that opportunity. We note that allowing the inspection of materials not disclosed is one of the statutory remedies a district court may impose for the failure to comply with discovery orders. See K.S.A. 2016 Supp. 22-3212(i) (stating that if a party determines during the course of a proceeding that it has failed to comply with the discovery orders, "the court may *order such party to permit the discovery or inspection of materials not previously disclosed*, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems just under the circumstances" [emphasis added]).

Rosario has not shown that he was prejudiced by the failure of the district court to grant a continuance. He does not maintain that his defense strategy would have been

11

different or that the trial would have resulted in a different verdict had he been granted a continuance to give him more time to view the video of the statement he gave to Lieutenant Dunn on the day of his arrest. Furthermore, based on our review of the record, we do not find that Rosario's opportunity to defend himself was prejudiced by the district court's decision. See *State v. Lewis*, 299 Kan. 828, 847, 326 P.3d 387 (2014).

Likewise, we cannot say that no reasonable person would have ruled upon the motion for a continuance the same way as the district court did in this case. The record on appeal reveals that the district court properly heard the motion for continuance and set forth its reasons on the record for denying the motion. The record also shows that the district court had previously granted Rosario a continuance from September 16, 2014—when the trial was originally set to commence—to March 30, 2015. Accordingly, we conclude that Rosario had adequate time to prepare for trial and that the district court's denial of a request for a second continuance was not arbitrary, capricious, or unreasonable.

*Motion to Suppress*

Rosario also contends that the district court erred in denying his motion to suppress statements he made to law enforcement on the day of his arrest. Specifically, he argues that "his statement to law enforcement was involuntary based on his intoxication as it related to his mental condition." In addition, Rosario argues that his statement to law enforcement should have been suppressed because a video recording of the interview was not provided to his attorney in a timely manner.

We apply a bifurcated standard when reviewing a decision on the suppression of a defendant's statements:

"In reviewing a trial court's ruling on a suppression issue, the appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. The appellate court does not reweigh evidence, assess the credibility of the witnesses, or resolve conflicting evidence. [Citations omitted.]" *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010).

K.S.A. 2016 Supp. 60-460(f) discusses the admissibility of confessions or statements by the accused, stating:

"In a criminal proceeding as against the accused, a previous statement by the accused relative to the offense charged [is admissible], but only if the judge finds that the accused (1) When making the statement was conscious and was capable of understanding what the accused said and did; and (2) was not induced to make the statement: (A) Under compulsion or by infliction or threats of infliction of suffering upon the accused or another, or by prolonged interrogation under such circumstances as to render the statement involuntary; or (B) by threats or promises concerning action to be taken by a public official with reference to the crime, likely to cause the accused to make such a statement falsely, and made by a person whom the accused reasonably believed to have the power or authority to execute the same."

When a defendant claims that his or her statement was not voluntary, the prosecution has the burden of proving by a preponderance of the evidence that it was voluntarily given. The essential inquiry is whether the statement was the product of the accused's free and independent will. Law enforcement coercion can be mental or physical. See *State v. Jackson*, 280 Kan. 16, 36, 118 P.3d 1238 (2005), *cert. denied* 546 U.S. 1184 (2006). Accordingly, we look at the totality of the circumstances surrounding the statement and determine its voluntariness by considering the following nonexclusive list of factors:

"'(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the

13

accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language.' [Citation omitted.]" *State v. Johnson*, 286 Kan. 824, 836, 190 P.3d 207 (2008).

In *State v. Sharp*, 289 Kan. 72, 81, 210 P.3d 590 (2009), the Kansas Supreme Court described the weight an appellate court should give these factors:

"'[T]hese factors are not to be weighed against one another on a balance scale, with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. [Citation omitted.] Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act. [Citations omitted.]'"

See also *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013).

In his motion to suppress filed with the district court, Rosario argued that his statement was inadmissible because his mental condition was impacted by his intoxication. He did not argue that a purported discovery violation was a basis for suppression.

"'The fact that an accused had been drinking and using drugs does not per se establish involuntariness.'" *State v. Norris*, 244 Kan. 326, 334-35, 768 P.2d 296 (1989). "All circumstances surrounding the giving of the statement must be examined to determine if the intoxication prevented the accused from voluntarily making a statement." *State v. Gilliland*, 294 Kan. 519, 529, 276 P.3d 165 (2012). In *Gilliland*, the Kansas Supreme Court found:

"These factors have included such things as whether there were manifestations of intoxication, the opinions of those who interacted with the accused about whether the accused seemed intoxicated, the trial court's independent evaluation based on observing or hearing the accused in a video or audio recording of the statement, the accused's familiarity with the police's interview procedures, and the accused's familiarity with the *Miranda* rights. Courts have noted markers such as whether an accused's answers were precise, normal, rational, or responsive; whether the accused was coherent and wide awake; and whether there was a detectable odor, swaying, bloodshot eyes, slurred speech, or other physical signs of intoxication. If the trial court has relied on some of these factors in ruling a statement was voluntary, an appellate court examines only whether there is substantial competent evidence to support the trial court's findings; an appellate court does not reweigh the evidence or independently reach our own determination of voluntariness. [Citations omitted.]" 294 Kan. at 529-30.

Rosario does not discuss any of these factors in his briefs filed in this appeal. Furthermore, he does not challenge whether Lieutenant Dunn's testimony—if believed by the district court—was sufficient to show by a preponderance of the evidence that he was not under the influence of drugs and that his statements were voluntarily given. Instead, Rosario argues that his statement should have been suppressed because a video recording of the interview was not produced within 21 days of arraignment and because the district court did not view the video at the hearing on the motion to suppress.

Issues not raised before the district court can generally not be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). Additionally, as a general rule, we do not consider an argument unless an appellant can show where the issue was raised and ruled on below. See *State v. Logsdon*, 304 Kan. 3, 28-29, 371 P.3d 836 (2016) (finding that there was no excuse for noncompliance with the requirements of Supreme Court Rule 6.02[a][5] [2015 Kan. Ct. R. Annot. 41] and failure to do so means the appellant has failed to preserve any argument not accompanied by a timely trial objection and a pincite in the brief). Both of these reasons are sufficient for us to reject Rosario's argument.

15

Significantly, even had Rosario raised these arguments below, we find that the district court's decision was supported by substantial competent evidence. In particular, we find that the State presented evidence upon which a reasonable person could conclude that Rosario was not under the influence at the time he gave his statement to Lieutenant Dunn. As indicated above, Lieutenant Dunn testified that he was familiar with the effects of PCP on a person and that Rosario did not exhibit any of the effects of PCP intoxication during the interview. This testimony, which the district court found to be credible, was sufficient for the State to establish by a preponderance of the evidence that Rosario's statement was voluntary. Thus, we conclude that the district court did not error in denying Rosario's motion to suppress.

*Prior Bad Acts*

In his pro se amended supplemental brief, Rosario contends that the district court erred in allowing the jury to hear evidence of prior bad acts when "[d]uring a conference between the prosecutor and defense counsel, a reference was made to the possible existence of a DNA sample taken from the defendant while at Hutchinson Correctional Facility." He argues that this prejudiced him because it left the jury to speculate as to his past criminal history and why he had been in prison. The State maintains that Rosario's argument fails because he did not pinpoint cite to the record to show when or where this conversation even occurred.

Although Rosario includes a record cite in his brief, it is not a pinpoint cite to where this statement was allegedly made. Instead, he cites more than 200 pages of one volume of the record. Moreover, we have reviewed the record and have not been able to locate any such statement. As such, it seems likely that if this statement was in fact made, it would have been outside the presence of the jury. Accordingly, we conclude that Rosario has failed to provide an adequate record to allow us to review this issue.

Additionally, Rosario failed to pinpoint the place in the record that shows that he objected to the evidence being admitted and the court ruled on its admissibility. His failure to do any of these things precludes our review of this evidentiary issue. See K.S.A. 60-404 (requiring a contemporaneous objection to admission of evidence to set aside verdict based on erroneous admission of evidence); *State v. Solis*, 305 Kan. 55, 62, 378 P.3d 532 (2016) (stating that the Kansas Supreme Court "has shown no indication that it intends to deviate from the requirement of a contemporaneous objection at trial in order to preserve an evidentiary issue for appellate review"). See also *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862 (stating that "[e]ven when the district court rules on the admissibility of evidence pretrial, a party must still make an objection at trial before the admission of the evidence because the unfolding of a case may require a reevaluation of the reasons for the initial ruling"), *cert. denied* 137 S. Ct. 310 (2016). We also decline to consider whether the district court should have given a limiting instruction because Rosario failed to show that any K.S.A. 60-455 evidence was actually presented to the jury.

*Opinion Testimony from Lieutenant Dunn*

Rosario also contends in his pro se amended supplemental brief that Lieutenant Dunn's testimony about the effects of PCP on a person was inadmissible. Specifically, he argues that no foundation was laid to establish him as an expert witness on this topic. However, Rosario failed to object to this testimony at trial. K.S.A. 60-404 provides that a judgment shall not be reversed based on "erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." See *State v. King*, 288 Kan. 333, 341-50, 204 P.3d 585 (2009). Accordingly, Rosario cannot prevail on this issue because of his failure to object at trial.

*Psychiatric Examination of Victim*

In his pro se amended supplemental brief, Rosario further contends that the district court erred in denying his request for a psychiatric examination of M.S. He claims there were serious questions about her veracity. Rosario then lists several things that he claims were inconsistencies in M.S.'s statements. But he does not attempt to establish why allegedly inconsistent statements necessitated a psychiatric examination of M.S.

The State, again, argues that we should not consider this issue because Rosario did not cite to the part of the record that showed where the issue was raised and ruled on by the district court. See *Logsdon*, 304 Kan. at 28-29; Rule 6.02(a)(5). Although the State does not dispute the fact that defense counsel filed a motion to compel an expert psychological examination of M.S., it contends that the arguments made by Rosario on appeal are different from those made before the district court. Moreover, we can find nothing in the record on appeal to show that the district court ever ruled on the motion. As the State points out, it is unclear from the record as to whether the request was withdrawn and, if not, why Rosario did not pursue the motion below.

"[A] trial judge has the discretion to order a psychiatric examination of the complaining witness in a sex crime case if the defendant presents a compelling reason for such examination." *State v. Gregg*, 226 Kan. 481, 489, 602 P.2d 85 (1979). Hence, we review the record to determine whether there has been an abuse of discretion. *State v. Lavery*, 19 Kan. App. 2d 673, 676, 877 P.2d 443, *rev. denied* 253 Kan. 862 (1993). In doing so in the present case, we find nothing in the record to show that the district court denied Rosario's motion. If it did, Rosario has failed to cite where we can locate such a ruling in the record. Thus, we have no basis on which to conclude that the district court erred.

*Ineffective Assistance of Counsel*

In his pro se supplemental brief, Rosario raises three claims of ineffective assistance of counsel. He argues that his defense counsel was ineffective for failing to properly cross-examine the nurse who testified as an expert witness for the State regarding Rosario's injuries or lack thereof. He argues that his defense counsel was ineffective for failing to ask the district court to redact the inflammatory things M.S. said about him in her video recorded interview before playing it at trial. And he argues that his defense counsel was ineffective for failing to properly cross-examine and impeach M.S.

The State contends that these three arguments cannot be raised for the first time on appeal. Generally, an appellate court will not consider an allegation of ineffective assistance of counsel raised for the first time on appeal. *Bogguess v. State*, 306 Kan. 574, 580, 395 P.3d 447 (2017); *State v. Van Cleave*, 239 Kan. 117, 119, 716 P.2d 580 (1986). This is because the district court is in the best position to rule on the merits of most ineffective assistance of counsel claims. Without an objection being raised below, the district court is not given the opportunity to consider and rule upon the issue. See *Rowland v. State*, 289 Kan. 1076, 1084, 219 P.3d 1212 (2009); *Van Cleave*, 239 Kan. at 119.

Kansas courts will, however, make an exception and address ineffective assistance of counsel claims for the first time on appeal in "extremely rare" cases where no evidentiary record needs to be established because the merits of the claims regarding trial counsel are obvious based on the appellate court's review of the record. *State v. Dull*, 298 Kan. 832, 839, 317 P.3d 104 (2014). We do not find this to be such a case. In other words, we do not find based on our review of the record that Rosario's allegations are obvious.

Judicial scrutiny of defense counsel's performance is highly deferential and requires consideration of all the evidence. We must presume that counsel's conduct fell within the broad range of reasonable professional judgment. *Kelly*, 298 Kan. at 970. To prevail on a claim of ineffective assistance of counsel, a defendant must establish that (1) the performance of defense counsel was deficient under the totality of the circumstances, and (2) this deficiency resulted in prejudice. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014). A defendant may establish prejudice by showing a reasonable probability that but for counsel's deficient performance, the outcome of the proceeding would have been different. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

Rosario does not argue that we should remand for a hearing in the district court on his ineffective assistance of counsel claim. In addition to improperly raising this issue for the first time on appeal, Rosario has not shown that his trial counsel was ineffective based on the record. For these reasons, we decline to consider Rosario's claims of ineffective assistance of counsel.

*Cumulative Error*

In both the brief filed on his behalf by appellate counsel and in his pro se amended supplemental brief, Rosario argues that the cumulative effect of trial errors requires reversal of his convictions. The cumulative error doctrine requires this court to determine whether the totality of the circumstances demonstrates that Rosario was substantially prejudiced and denied his right to a fair trial. See *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009). The doctrine does not apply if no error or only one error supports reversal. 289 Kan. at 71. Rosario has failed to prove that any errors occurred at his trial. Because we found no errors, it would be impossible for us to reverse based on cumulative error.

*Calculation of Criminal History Score*

Finally, Rosario contends that the district court erred by including certain adult convictions and a juvenile adjudication as person felonies in calculating his criminal history score for the purpose of determining his sentence in this case. At trial, Rosario objected to his criminal history score, and his objection was overruled by the district court. Additionally, the record on appeal contains the objection to criminal history filed by Rosario in which he alleges that "[t]he person felonies are not valid convictions." At the sentencing hearing, Rosario argued that his prior person felonies should not be counted because they occurred so long ago. Nevertheless, he acknowledged that under the current law, they could be counted.

On appeal, Rosario first argues that the district court violated his rights under the Sixth and Fourteenth Amendment to the United States Constitution based on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), by using his prior convictions and juvenile adjudications to increase his sentence without requiring the State to prove them beyond a reasonable doubt. He acknowledges that our Supreme Court previously resolved these issues contrary to his position, but he states that he is arguing it to preserve it for federal review. See *State v. Hitt*, 273 Kan. 224, 236, 42 P.3d 732 (2002); *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). We are duty bound to follow precedent established by our Supreme Court unless there is an indication that it is departing from the precedent. *State v. Hall*, 298 Kan. 978, 983, 319 P.3d 506 (2014). The Kansas Supreme Court does not appear to be departing from its holdings in *Ivory* and *Hitt*. See *State v. Williams*, 306 Kan. 175, 176, 392 P.3d 1267 (2017); *State v. Waller*, 299 Kan. 707, 728-29, 328 P.3d 1111 (2014); *State v. Benson*, 295 Kan. 1061, 1068, 287 P.3d 927 (2012); *State v. Bennington*, 293 Kan. 503, Syl. ¶ 9, 264 P.3d 440 (2011); *State v. Riojas*, 288 Kan. 379, 388, 204 P.3d 578 (2009); *State v. Fewell*, 286 Kan. 370, 394-96, 184 P.3d 903 (2008).

Rosario also argues that because his juvenile person felony adjudication happened so long ago, it should not have been scored as a person felony for criminal history purposes under K.S.A. 2016 Supp. 21-6810. But Rosario does not specify the language of K.S.A. 2016 Supp. 21-6810 that supports his position nor does he cite a specific subsection of the statute that he claims is applicable. To the extent that he is arguing that his juvenile adjudication for aggravated assault from 1995 is decayed under the recently amended K.S.A. 2016 Supp. 21-6810(d)(4)(B), this court has found that the amendment does not apply in criminal cases when the conduct in the current case occurred before the amendment became effective on July 1, 2016. See *State v. Martinez*, No. 116,175, 2017 WL 3947378, at *10-12 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* October 5, 2017; *State v. Villa*, No. 115,595, 2017 WL 3207087, at *2-4 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* August 25, 2017; *Parker v. State*, No. 115,267, 2017 WL 947821, at *4 (Kan. App. 2017) (unpublished opinion); *State v. Riley*, No. 116,046, 2017 WL 1426208, at *1 (Kan. App. 2017) (unpublished opinion). Thus, Rosario has failed to show that his juvenile person felony was improperly scored under K.S.A. 2016 Supp. 21-6810.

Affirmed.